IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DARLENE CROUCH, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:06-cv-113 |
| | § | |
| J.C. PENNEY CORPORATION, INC., | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Before the court are the following:

1. Defendant's Amended Motion for Summary Judgment (de # 34);

2. Plaintiff's Response to Defendant's Motion for Summary Judgment (de # 39);

3. Defendant's Reply Brief in Support of its Motion for Summary Judgment (de # 42);

4. Plaintiff's Sur-reply Brief in Opposition to Defendant's Motion for Summary Judgment (de # 43); and

5. Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment (de # 68).

Having considered the motion and the briefing responsive thereto, the court is of the opinion that Defendant's Amended Motion for Summary Judgment should be GRANTED IN PART and DENIED IN PART.

**I.  BACKGROUND**

J.C. Penney Corporation ("Defendant") moves the court to grant summary judgment as to each of Darlene Crouch's ("Plaintiff") claims. Plaintiff filed this lawsuit seeking relief for

alleged wrongful termination in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et. seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.* and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et. seq.* (Pl.'s First Am. Compl. ¶ 1.01.) Plaintiff also presses a claim for defamation under Texas law. (*Id.*) Plaintiff has abandoned her ERISA claim, and the court will not consider it. (Pl.'s Resp. 23.)

Plaintiff began working for Defendant in 1983. (Pl.'s Resp. 1.) By 1997, Plaintiff had enjoyed a series of promotions and was working as a Team Manager in the Store Systems Technical Support Center ("SSTSC") in Dallas. (Def.'s Am. Mot. 2.) The SSTSC handled calls from Defendant's stores regarding problems with computer software and hardware. (*Id.*) As a Team Manager, Plaintiff supervised a team of employees who handled calls from Defendant's stores. (*Id.*) In June of 2005, Defendant relocated the SSTSC to Plano. (*Id.*) Though Plaintiff had until then worked a typical five-day work week, Plaintiff's shift moved to the three-day weekend shift on Saturday through Monday at the time of the move at her request. (*Id.*)

Plaintiff applied for and was granted approval to take leave as needed to deal with her recurring bronchitis condition under the FMLA. (Pl.'s Resp. 2.) In addition to taking time off under the FMLA, Plaintiff also missed work on June 30, 2005 for a doctor's appointment unrelated to her recurring bronchitis. (*Id.*) Plaintiff also missed seven consecutive days of work in August of 2005 in relation to both her bronchitis condition and dental surgery. (*Id.* at Pl.'s App. 279.) Plaintiff was required by her oral surgeon to delay the surgery because he was of the opinion that a concurrent bronchitis flare up would complicate the surgery. (*See id.*) As such, Plaintiff was prescribed antibiotics to facilitate the surgery, and she missed the seven days of

work. (*Id*.) Plaintiff, initially unaware that all seven absences qualified for FMLA protection, eventually communicated FMLA applicability of these absences to Defendant on September 4, 2005. (*Id*. at Pl.'s App. 303.)

Upon her return to work in late August of 2005, Plaintiff was counseled about her absences by Patricia Grant, her immediate supervisor. (*Id*. at 4.) On September 19, 2005, Defendant imposed a Development Plan on Plaintiff. (*Id*. at Pl.'s App. 298-300.) Development Plans are used by Defendant to create a course of action to enhance a given employee's effectiveness. (Def.'s Am. Mot. 9.) The Development Plan, signed by Plaintiff and her supervisors, cited several areas of improvement, including paying more attention to detail and providing more effective leadership. (Pl's Resp. Pl.'s App. 298-300.) According to the Plan, it was crucial that Plaintiff exercise greater care in notifying Defendant when Plaintiff was to take FMLA leave. (*Id*. at Pl.'s App. 298.)

Plaintiff and Ronald Smith, a subordinate, were involved in disagreement in early October of 2005. (*Id*. at 6.) This incident, the details of which are immaterial, spurred Grant to call a meeting of herself, Plaintiff, Smith, and Queen Beasley, the other manager on the weekend shift. (*Id*. at 5-6.) Following the meeting, Smith asked to discuss with Grant some additional concerns he had about Plaintiff. (Def.'s Mot. 3.) In addition to hearing several concerns, Grant directed Smith to talk with someone in the Human Resources department, where he later talked with Marilyn Ramey. (*Id*.) Smith told Ramey that the weekend team was experiencing diminishing morale and that Plaintiff loudly and publicly reprimanded agents, told sexually provocative jokes, intimidated workers by sharing stories of violent acts committed by herself and family members, made fun of another agent's medical condition, and threatened Smith at

knifepoint while at work. (*Id*. at 4.) Specifically, Smith complained that Plaintiff picked up a pocketknife that was on his desk, pointed it at him, and ordered him to read a document she had sent him. (*Id*.)

These accusations led Defendant to commence an investigation into Plaintiff's behavior. (*Id*.) The investigation lead to corroboration of all of Smith's accusations aside from making fun of the other agent and the knife incident. (*Id*.) The investigation also included an interview of Plaintiff on October 24, 2005 by Human Resources personnel. (*Id*. at 5.) Plaintiff denied all of the allegations against her. (*Id*.) During the interview, Brenda Cummings asked Plaintiff if she had ever pointed a pencil, pen or anything else at another employee, and Plaintiff stated that she had not. (*Id*.) Plaintiff returned later that afternoon and stated that "she wanted to tell them something about the 'knife' that she remembered." (*Id*.) Lisa Scott, also present at the interview, pointed out that Plaintiff was never asked about a knife, prompting Plaintiff to say that she meant to talk about an incident with a gun, referencing an unrelated incident that had previously occurred. (*Id*. at 5-6.) Both Scott and Cummings took Plaintiff's nonresponsive statement as corroboration of the knife incident with Smith. (*Id*.) Based on their findings, Human Resources referred the investigation to Plaintiff's chain of supervisors for their thoughts. (*Id*. at 6-7.)

The investigation culminated in a November 7th interview with Plaintiff at which she provided additional corroboration of the knife incident. (*Id*. at 8.) There, Plaintiff said, "[i]f Ron said I used a knife, it is an outright lie." (*Id*.) As with the detail about the knife, nobody had mentioned that Smith was the person who had alleged the knife incident, prompting those in charge to interpret Plaintiff's statement as further proof that the knife incident did in fact occur.

(*Id*. at 9.) Based on the investigation, and the November 7th interview in particular, Defendant terminated Plaintiff's employment. (*Id*.)

Plaintiff alleges that the nearly month-long investigation and the proffered reasons for termination are merely pretextual. She claims that the real reasons for her termination are disability discrimination and her use of FMLA leave. Defendant counters by arguing that Plaintiff was fired because she was rude and unprofessional, told sexually suggestive jokes, and pointed a knife at Smith while on the job.

## II. LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981)(citations omitted). The substantive law identifies which facts are material. *See id*. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See id*. at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary

judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 323, 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).  The nonmovant must adduce affirmative evidence.  *Anderson*, 477 U.S. at 257.

### III. DISCUSSION AND ANALYSIS

**A. Plaintiff's FMLA Claim**

The FMLA entitles eligible employees to take up to twelve weeks of leave from work in a twelve month period in order to attend to an array of extra-occupational concerns, including the treatment of a "serious health condition."  29 U.S.C. § 2612(a)(1)(D) (2006).  Section 105 of the FMLA provides that an employer "shall not discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the Act.  29 U.S.C. § 2615(a)(2) (2006).  This section creates a set of rights termed "proscriptive rights" that are similar to actions for discrimination and retaliation found in other discrimination statutes such as Title VII.  *Haley v. Alliance Compressor, LLC*, 391 F.3d 644, 649 (5th Cir. 2004).

FMLA retaliation claims are analyzed under the framework enunciated by the Fifth Circuit Court of Appeals in *Richardson v. Monitronics Int'l*.  In *Richardson*, the court addressed the applicability of a 2003 Supreme Court case to FMLA claims.  *Richardson*, 434 F.3d 327, 333 (5th Cir 2005); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).  *Desert Palace* held that a Title

VII plaintiff need not present direct evidence of discrimination in order to prevail on a mixed motive theory of discrimination. *Id*. at 101.  The Fifth Circuit Court of Appeals has adopted this rule to claims pressed under the Age Discrimination in Employment Act. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Extending *Rachid* in the name of consistency, *Richardson* provides that FMLA retaliation claims are to be analyzed under the modified version of the familiar *McDonnell Douglas* burden-shifting framework at the summary judgment level:

> (1) the employee must make a *prima facie* case of discrimination; (2) the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or -- and herein lies the modifying distinction -- (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.  If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus.

*Richardson*, 434 F.3d at 333 (adopting the holding of *Rachid* to FMLA retaliation cases).  In order to establish a *prima facie* case of FMLA retaliation, the employee must show that "(1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge." *Richardson*, 434 F.3d at 333.

*Richardson*, which adopted *Rachid* in the FMLA context, essentially merges what were two tests into a single, concise inquiry. *Rachid*, 376 F.3d at 312 ("Our holding today...represents a merging of the *McDonnell Douglas* and *Price Waterhouse* approaches.").  Before, a plaintiff could prove FMLA retaliation either by direct evidence or under the *McDonnell Douglas* framework. *See Fabela v. Socorro Indep. School. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).  Part

3(b) of the *Richardson* test is merely a restatement of the direct evidence analysis applied in this circuit in such cases. *Compare Richardson*, 434 F.3d at 333 *with Fabela*, 329 F.3d at 415. The other portions of the *Richardson* framework likewise restate the *McDonnell Douglas* analysis. That an aggrieved employee can proceed on a claim of FMLA retaliation under either alternative of Part 3 of the *Richardson* test shows that the formerly autonomous evidentiary paths have been merged into a unitary model.

    *1. Prima facie evidence*

Plaintiff must first prove that she was engaged in a protected activity, she was discharged, and that a causal connection links those circumstances. *Richardson*, 434 F.3d at 333. The parties agree that the first two elements of the *prima facie* case are satisfied. Plaintiff points to two facts to establish the third prong. First, Plaintiff argues that other employees were equally rude at work without having been fired. (Pl.'s Resp. 18.) This argument goes more to rejecting Defendant's proffered reasons as pretextual. In any event, how Defendant responded to instances of unprofessional behavior on the part of other employees can hardly be said to establish a causal link between Plaintiff's use of FMLA leave and her termination. Second, Plaintiff discusses an altercation during which another employee, Wilbur Young, threatened to get a gun and "blow management away." (*Id*.) The argument is that because Young was not fired as a result of this threat, the fact that Plaintiff was fired for making a threat constitutes a causal link to complete her *prima facie* case. This argument fails for two reasons. Again, the argument wrongfully attempts to establish a causal connection in Plaintiff's case on the basis of decisions made regarding other employees. Also, assuming that the difference in treatment of the two incidents is applicable to the issue at hand, the incidents, while both intolerable, are not of the same

severity. One involves the actual use of a dangerous weapon while the other threatens it. Termination for the more egregious outburst in the absence of termination for the less egregious does not avail Plaintiff in establishing her *prima facie* case. Having concluded that Plaintiff's claim fails based on the absence of evidence establishing a *prima facie* case, the court could stop its analysis here. However, in an abundance of caution, the remaining steps of the *Richardson* test will be discussed.

*2. Legitimate non-discriminatory reasons*

Defendant contends that it fired Plaintiff because she pointed a knife at a coworker, publicly reprimanded employees, told sexually provocative jokes, told stories about violent behavior committed by herself and her family, and made fun of an employee's medical condition. (Def.'s Mot. 21.) These concerns were investigated and, in large part, substantiated. Defendant has, therefore, satisfied its burden of proffering a legitimate, non-discriminatory reason for terminating Plaintiff.

*3(a). Pretext*

Plaintiff argues that each of these justifications is pretextual and that she was actually fired because she utilized her leave pursuant to the FMLA. (Pl.'s Resp. 18.) First, Plaintiff reiterates her argument that non-FMLA employees engaged in equally unprofessional behavior and that only Plaintiff was fired for this reason. Plaintiff offers several instances where other employees displayed less than pure behavior. However, Plaintiff ignores the fact that what constitutes "equally rude" is a subjective determination. For a finder of fact to conclude that the weight attached to Plaintiff's unprofessional behavior was so out of line with judgments made regarding other incidents of malfeasance as to conclude that this justification was pretext, it

would have to engage in "second-guessing of business decisions." *Deines v. Texas Dep't. of Protective & Regulatory Servs.*, 164 F.3d 277, 281 (5th Cir. 1999). Such is not the role of anti-discrimination laws. *Id*. Defendant viewed Plaintiff's behavior as weighing on the morale of those at the SSTSC on the weekend shift, suggesting that Plaintiff's conduct may in fact have been more unprofessional than that of others. Moreover, Plaintiff's behavior was confirmed by a host of employees, indicating that she may have more commonly engaged in rude behavior. This justification, therefore, cannot be said to be merely pretextual.

Plaintiff also argues that other employees told jokes in the office place. However, Plaintiff does not assert that the jokes told by others were sexually suggestive. Clearly one joke may be offensive while another simply may not be. That others told jokes and remained employed, while Defendant reasonably believed Plaintiff to have told inflammatory jokes and she did not remain employed fails to justify labeling this reason as pretext.

Plaintiff next gives two arguments that the knife incident was obviously fabricated by Smith. (Pl.'s Resp. 19.) First, Plaintiff argues that the differing treatment of Young after his threatening incident and Plaintiff after hers exposes this justification as pretext. That argument has been addressed above. Plaintiff also argues that Smith's story was so devoid of credibility that any claimed belief in the story must be false and, thus, mere pretext for FMLA retaliation. To be sure, there were a number of reasons to doubt Smith's account. Smith and Plaintiff got into a disagreement that led to the meeting between the two of them, Grant, and Beasley. Moreover, Smith had a reputation as being a "troublemaker." (*Id*. at 9.) Lisa Scott initially regarded the complaint as suspect. (*Id*. at Pl.'s App. 222.) However, the story was later corroborated by Plaintiff's curious behavior at each of the two meetings. The issue is not

whether the knife incident actually occurred. Rather, the issue is whether Defendant's belief that the incident occurred was made in good faith so as to preclude a finding that reliance on this justification was pretextual. The circumstances indicate this to have been the case as a matter of law because, without having been told that Ronald Smith was the one who made the allegations and without having been told that the allegations involved the use of a knife, the Plaintiff volunteered this information during the two meetings.

Because Defendant was completely unable to corroborate whether Plaintiff insulted another employee on the basis of a medical condition, the court will assume without deciding that this justification was pretextual. However, because the court has found as a matter of law that the Plaintiff has failed to demonstrate that the Defendant's other legitimate, nondiscriminatory reasons were pretextual, the question of whether this justification withstands scrutiny is immaterial.

*3(b). Motivating Factor*

Plaintiff also offers a direct evidence theory of retaliation, triggering analysis under Part 3(b) of the *Richardson* test. Under this inquiry, Plaintiff must show that her use of FMLA leave was a motivating factor in Defendant's decision to terminate her employment. *Richardson*, 434 F.3d at 333. The strongest of Plaintiff's direct evidence is an August 22, 2005 email sent to Grant by Dick Patefield, one of Plaintiff's supervisors. In that email, Patefield said with regard to Plaintiff, "Pat, something has to give on this. She was sick all weekend. We need someone that we can depend upon to show up on weekends. We need to persue [sic] what we can do with personnel once you get back from vaca[tion]." (Pl.'s Resp. Pl.'s App. 326.) Plaintiff argues that this email inspired the creation of the Development Plan, the existence of which played a role in

her termination in November of 2005. Plaintiff also points to certain statements by Scott as direct evidence of FMLA retaliation. (Pl.'s Resp. 17.)

Plaintiff's reliance on the email sent by Patefield as direct evidence of FMLA retaliation is misplaced. The email was sent nearly two weeks before Patefield could have known that Plaintiff's August 2005 absences were covered by FMLA. Patefield's email, therefore, did not indicate animus towards Plaintiff because she was using FMLA leave. Rather, the email expressed concern that Plaintiff's record of attendance was deficient for reasons unrelated to FMLA. That the August absences were later discovered to have been covered by FMLA transforms neither Patefield's state of mind nor his email of August 22nd into direct evidence of FMLA retaliation. There is no evidence in the record to indicate that the email or the sentiment thereby conveyed ever resurfaced in the discussions surrounding Plaintiff's fate.

Plaintiff also argues that the Development Plan was directed at Plaintiff because of her FMLA absences. The argument is that once the applicability of the FMLA to the August absences was determined, Plaintiff's attendance was within company guidelines, and the Development Plan should have been dropped. While providing notice of FMLA leave was among the issues in the Development Plan, other considerations contained therein continued to support its implementation even after attendance did not. Among the concerns expressed in the Development Plan was Plaintiff's leadership and professionalism. (Pl.'s Resp. Pl.'s App. 299.) Many of these concerns dated back to at least 1998. (*Id*. at Pl.'s App. 54.) Thus, institution of the Development Plan does not constitute direct evidence of FMLA retaliation.

Finally, Plaintiff avers that Scott told, and now denies telling her, that because she was under the Development Plan, Plaintiff was being fired instead of warned. (Pl.'s Resp. 17.) There

simply is no support for this assertion in the record aside from Plaintiff's self-serving declaration. *See Anderson*, 477 U.S. at 257.  Plaintiff has also introduced the declaration of another employee who claims that Scott made comments that "too many employees were abusing their sick leave." (*Id*.)  There is no evidence that this statement, or the disposition it represents, was directed at Plaintiff.  Therefore, as a matter of law, the statements, assuming they were made, do not constitute direct evidence of FMLA retaliation.  Even if the court were to assume that Plaintiff has proffered direct evidence of FMLA retaliation, Defendant has put forth more than enough evidence to prove that it would have taken the same action in the absence of discriminatory animus.  *Richardson*, 434 F.3d at 333.

**B.  Plaintiff's ADA Claim**

With respect to the ADA, the Fifth Circuit Court of Appeals allows claimants to establish discrimination through the presentation of direct evidence or under the *McDonnell Douglas* burden-shifting framework.  *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999).  Plaintiff relies on the same evidence to establish her ADA claim.  For the same reasons that the summary judgment evidence fails to establish a triable issue of material fact with respect to Plaintiff's FMLA claim, her ADA claim suffers the same fate.

**C.  Plaintiff's Defamation Claim**

Plaintiff also presses a claim for defamation against Defendant.  Plaintiff's claims rest on the comments made by Smith to Grant and Ramey and on Scott's publication of those comments during the course of the investigation.  To establish a claim for defamation, Plaintiff, a private figure, must demonstrate that Defendant "(1) published a statement (2) that was defamatory concerning the plaintiff (3) while acting with...negligence...regarding the truth of the statement."

*Harvest House Publishers v. The Local Church*, 190 S.W.3d 204, 210 (Tex. App.— Houston [1st Dist.] 2006, pet. denied).  In order to impute liability to Defendant based on any statements made by Smith, Plaintiff must establish that Smith's "tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired."  *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002).  "[I]n the defamation context," an employee acts within the scope of employment if the employee's statements were made in furtherance of the employer's business, and for the accomplishment of the objective for which the employee was hired."  *Id*. at 578.

      For the purposes of this motion, Defendant has assumed that Smith's statements were defamatory.  (Def.'s Mot. 11.)  As part of his employment with Defendant, Smith was authorized to report malfeasance to Human Resources.  (Pl.'s Sur-reply 2.)  While the existence of such an open-doors policy does not establish that statements made pursuant to such are made within the scope of Defendant's business, *Minyard* at 579, Smith may have been motivated, at least in part, to improve the working conditions of the weekend team by ensuring that any malfeasance by Plaintiff was addressed by her superiors.  (*See* Pl.'s Resp. Pl.'s App. 307.)

      This distinction is critical.  In *Rodriguez*, the Fifth Circuit Court of Appeals relied in part on Section 236 of the Restatement (Second) of Agency in finding that defamatory statements made with mixed motives were made within the scope of employment.  *Rodriguez v. Sarabyn*, 129 F.3d 760, 772 (5th Cir. 1997).  Inconsistent statements made by Sarabyn and others about Rodriguez were not made outside of the scope of employment simply because they may have been motivated, in part, by selfish desires.  *Id*. at 770-71.  Comment b to Section 236 states "[i]f

the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service." RESTATEMENT (SECOND) OF AGENCY § 236, cmt. b (1958).  The statements, though defamatory, were made pursuant to a duty created by the A.T.F. and were thus within the scope of employment. *Rodriguez*, 129 F.3d at 770-71.

      The American Law Institute has since published the third edition of the Restatement of Agency, and it applies with equal force in Plaintiff's favor.  Section 7.07(2) states that "[a]n employee acts within the scope of employment when...engaging in a course of conduct subject to the employer's control." RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (2006).  Comment b is helpful in stating that if an employee commits a tort "while acting within a course of conduct subject to the employer's control, the employee's conduct is within the scope of employment unless the employee was engaged in an independent course of conduct not intended to further any purpose of the employer." *Id*. at cmt. b.  The most recent Restatement was recently cited by the Texas Supreme Court. *In re Merrill Lynch Trust Co. FSB*, __S.W.3d__, 2007 WL 240845 *8 n.15 (Tex. 2007).  As such, it is likely to follow the related provision in Section 7.07, *Rodriguez*, 129 F.3d at 768, and this court is persuaded by that section.

      It is undisputed that Smith, in making statements defamatory for purposes of this decision, was acting pursuant to authority conferred upon him by Defendant.  A genuine issue of material fact exists, however, as to Smith's motivations for making the statements.  As he and Plaintiff had just had a dispute, Smith may have been acting purely out of personal spite for Plaintiff.  If the fact finder agrees, then Smith's statements will not be attributable to Defendant because Smith would have acted in "an independent course of conduct not intended to further

any purpose of the employer." RESTATEMENT (THIRD) OF AGENCY § 7.07(2), cmt. b (2006). On the other hand, if Smith made the statements because he thought they would lead to disciplinary action that would enhance the workplace, then the statements would be attributable to Defendant because they would have been made in furtherance of Defendant's purpose. *Id.*; *Minyard Food Stores*, 80 S.W.3d at 579 (discussing the distinction between defamatory comments made *for* one's employer and made *to* one's employer). The court finds that a genuine issue of material fact exists as to why Smith made the comments to Grant and Ramey, defeating Defendant's motion for summary judgment with respect to these comments.

Plaintiff also claims to have been defamed on the basis of Scott's republication of Smith's remarks during the investigation initiated in response thereto. Defendant avers that any republication of Smith's comments by Scott is privileged. The Texas Supreme Court recognizes a qualified privilege that attaches to statements made during the course of an investigation of employee wrongdoing. That privilege was aptly described in *Randall's Food Markets v. Johnson*:

> [A]n employer has a conditional or qualified privilege that attaches to communications made in the course of an investigation following a report of employee wrongdoing. The privilege remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate. Proof that a statement was motivated by actual malice existing at the time of publication defeats the privilege. In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth. To invoke the privilege on summary judgment, an employer must conclusively establish that the allegedly defamatory statement was made with an absence of malice.

*Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (internal citations omitted). The court finds that genuine issues of material fact exist with regard to the applicability of the qualified privilege to Scott's republication of Smith's statements.

## IV.  CONCLUSION

Based on the foregoing, the court is of the opinion that Defendant's Motion for Summary Judgment should be GRANTED with respect to Plaintiff's claims under the FMLA, the ADA, and ERISA.  The court is also of the opinion that Defendant's motion should be DENIED with respect to Plaintiff's defamation claim.

IT IS SO ORDERED.

**SIGNED this the 26th day of September, 2007.**

_____
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE